**UNITED STATES of America**

v.

**Carl E. BINETTE, Defendant.**

**Case No. 10–cr–30036–MAP.**

United States District Court,
D. Massachusetts.

Dec. 8, 2011.

Vassili Thomadakis, U.S. Attorney's Office, J. Joseph Moakley, Boston, MA, for United States of America.

Myles Jacobson, Law Office of Myles Jacobson, Northampton, MA, for Defendant.

***MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS COUNT VII (Dkt. No. 26)***

PONSOR, District Judge.

### I. *INTRODUCTION*

Defendant, Carl Binette, is accused of insider trading and obstruction of justice. The obstruction of justice charge is Count VII of the government's complaint, and it accuses Defendant of violating 18 U.S.C. § 1512(c)(2). This section of the statute, enacted after the Enron scandals, makes it a crime to corruptly obstruct justice before an "official proceeding."

Defendant moves to dismiss Count VII under several different theories. His primary argument is that the alleged "official proceeding" he was charged with obstructing was not an "official proceeding" as envisioned by the statute.

### II. *FACTS*

Defendant's uncle, Peter Talbot, was formerly an employee of The Hartford, an insurance company. The government alleges that Talbot, through his employment

at The Hartford, learned that his company was considering the purchase of Safeco, another insurance company. Talbot, the government says, tipped off his nephew to the potential acquisition and helped him set up a brokerage account to purchase options on Safeco stock. While The Hartford did not ultimately purchase Safeco, another insurer—Liberty Mutual—did. Once the acquisition by Liberty Mutual was announced, Safeco's stock price soared and Talbot and Defendant made over $600,000 by exercising the options they had purchased.

Meanwhile, the Securities and Exchange Commission ("SEC") began an investigation into suspicious trading activity surrounding Safeco equities in the days before Liberty Mutual's acquisition was announced. As part of that investigation, the SEC contacted Defendant and asked to speak with him about his purchases of Safeco options. According to the record, a group of SEC attorneys and investigators made a conference call to Defendant at the car dealership where he worked as a salesman. It is unclear whether Defendant was ever given *Miranda* warnings or even told that a failure to tell the truth could lead to criminal charges.

What happened next is undisputed. Defendant decided to take the SEC's call and answer questions. He told the SEC attorneys that he had not spoken to anyone else about his investment in Safeco. Instead, he claimed he had read about Safeco in internet chatrooms and had a dream that the company would be acquired. In a subsequent proffer session with the agency, according to the government, he later admitted that none of these statements were true.

### III. *DISCUSSION*

It is undisputed that the SEC's investigation of Defendant was a "preliminary investigation" rather than a "formal investigation." In the former, staffers at the Commission undertake an investigation without first obtaining approval from its Commissioners. In this type of informal agency action the agency's investigators cannot require testimony under oath, nor can they compel the production of documents and witnesses through subpoenas. 17 C.F.R. § 202.5. They can, apparently, ask a witness to answer questions under oath if he chooses to give testimony. William McLucas et al., *An Overview of Various Procedural Considerations Associated with the Securities and Exchange Commission's Investigative Process,* 45 Bus. Law. 625, 628 (1990). The record currently before the court does not indicate whether Defendant responded to the telephone inquiry under oath, or even if the SEC requested that Defendant do so. In any event, should SEC investigators decide that they need to compel testimony under oath or the attendance of witnesses, they must ask the Commissioners to vote to allow the commencement of a formal investigation. 17 C.F.R. § 202.5.

Defendant argues that the preliminary investigation conducted here was not an "official proceeding" under 18 U.S.C. § 1512(c)(2). That statute, enacted as part of the post-Enron Sarbanes–Oxley legislation, reads as follows:

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity, or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 512.

The Supreme Court has not yet addressed whether preliminary investiga-

tions by the SEC are "official proceedings" for purposes of this statute. *See* Julia Schiller, *Deterring Obstruction of Justice Efficiently*, 63 N.Y.U. Ann. Surv. Am. L. 267, 307 (2008) (*citing Arthur Andersen, LLP v. United States*, 544 U.S. 696, 707 n. 10, 125 S.Ct. 2129, 161 L.Ed.2d 1008 (2005)).

The Fifth Circuit is one of the few circuit courts of appeal to have addressed what qualifies as an "official proceeding" under 18 U.S.C. § 1512(c)(2). In *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008), the court of appeals addressed whether rogue Border Patrol agents accused of lying to that agency's inspector general's office were guilty of obstructing an "official proceeding" under Section 1512(c)(2). In that case, two Border Patrol agents shot an illegal alien smuggler trying to cross the border, and then concealed that fact when the agency conducted an internal investigation. *Id.* at 460. Based on this, the defendants in *Ramos* were convicted of a violation of Section 1512(c). On appeal, the Fifth Circuit held as a matter of law that the Defendants had not obstructed an "official proceeding," since the agency's internal investigation was not an "official proceeding" under the statute. *Id.* at 463. Applying this analysis, they reversed the district court and vacated the convictions.

In analyzing the statute, the court of appeals found the following:

1.  The statute was intended to fight mayhem, murder, and intimidation in criminal proceedings, to protect witnesses and victims from such conduct, and to fight corporate fraud. *Id.* at 462.

2.  18 U.S.C. § 1515(a)(1) defines an official proceeding as one that takes place "before a Federal Government agency which is authorized by law." The use of the word "before" indicates that it "involves some formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency." *Id.* at 462–63.

3.  "Official proceeding" is used throughout Section 1512 in "a manner that contemplates a formal environment in which persons are called to appear or produce documents." *Id.* at 463.

Under the Fifth Circuit's definition of "official proceeding," which this court finds persuasive, Defendant's conversation with the SEC was not an official proceeding as contemplated by the statute. The phone call between the SEC investigators and Defendant obviously was not a "formal convocation" called by the agency where Defendant was directed to appear. Instead, the agency's investigators chose to give their conversations with Defendant a far more casual appearance. Here, as in *Ramos*, the SEC's phone call to Defendant was merely an investigation in its "preliminary stages." *Id.* at 463.

Moreover, the Fifth Circuit found that, while confident of its interpretation of "official proceeding," the ambiguity surrounding the phrase's meaning and the lack of binding precedent justified applying the rule of lenity. *Id.* at 463–64; *see also United States v. Santos*, 553 U.S. 507, 514, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008) (plurality opinion) ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."). Given the ambiguity in the statute, this court, like the Fifth Circuit, finds that the rule of lenity governs.

The government cites several cases to argue that Section 1512 includes preliminary investigations. Yet, none of these cases involved a situation—as far as is clear from the record—where a person was accused of lying in a preliminary SEC investigation alone. The closest case is *United States v. Black*, No. 05–CR–727, 2007 WL 3254452 at *13 (N.D.Ill. Nov. 5,

2007). However, in that case, the defendant was charged with lying to *both* the SEC and the grand jury, the latter of which is specifically criminalized by the statute.

Moreover, in the other cases the government cites, most of which involve the pre-Enron language of an earlier version of Section 1512, there are far more indicia of formality. For example, in *United States v. Kelley*, 36 F.3d 1118, 1128 (D.C.Cir. 1994), the D.C. Circuit found that an investigation by the U.S. Agency for International Development's inspector general's office was an "official proceeding." In *Kelley*, the agency conducting the investigation was "empowered to issue subpoenas and to compel sworn activities." *Id.* Here, the SEC Commissioners had not yet voted to pursue an investigation, meaning that the agency's investigators could not issue subpoenas or compel attendance and testimony.

Indeed, the *Kelley* court relied on an earlier case, *United States v. Batten*, 226 F.Supp. 492 (D.C.D.C.1964), interpreting whether a similar statute, 18 U.S.C. § 1505, applied to a *formal* SEC investigation. In that case, the SEC voted to undertake a formal investigation, issued subpoenas to the parties, and administered oaths. *Id.* at 493. The SEC did not choose to take advantage of any such investigative tools at its disposal when investigating Defendant in this case.

### IV. *CONCLUSION*

For the foregoing reasons, Defendant's Motion to Dismiss Count VII (Dkt. No. 26) is hereby ALLOWED. Counsel will appear for a status conference on December 13, 2011 at 10:00 a.m.

It is So Ordered.